1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   NANCY DONALDSON,                    )    NO. CV 05-05122-MAN
                                         )
12                   Plaintiff,          )
           v.                            )    MEMORANDUM OPINION AND ORDER
13                                       )
                                         )
14   MICHAEL J. ASTRUE,[1]               )
     Commissioner of the                 )
15   Social Security Administration,     )
                                         )
16                   Defendant.          )
                                         )
17   ─────────────────────────────────

18        Plaintiff Nancy Donaldson filed a Complaint on July 15, 2005,

19   seeking review of the denial by the Social Security Commissioner

20   ("Commissioner") of Plaintiff's claim for Disability Insurance Benefits

21   ("DIB").  On August 11, 2005, the parties consented to proceed before

22   the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §

23   636.  The parties filed a Joint Stipulation ("JS") on May 12, 2006, in

24   which:  Plaintiff seeks an order reversing the Commissioner's decision

25

26   ─────────────────

27        [1]   Michael J. Astrue became the Commissioner of the Social
     Security Administration on February 12, 2007, and is substituted in
     place of former Commissioner Joanne B. Barnhart as the Defendant in this
28   action.  (See Fed. R. Civ. P. 25(d)(1); Section 205(g) of the Social
     Security Act, last sentence, 42 U.S.C. § 405(g).)

and awarding benefits or, alternatively, remanding the case for further appropriate proceedings; and Defendant requests that the Commissioner's decision be affirmed.  (JS at 38-39.)  The Court has taken the parties' JS under submission without oral argument.

### SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for DIB on August 24, 1999. (Administrative Record ("A.R.") 133-35.)  Plaintiff claims to have been disabled since December 22, 1997, due to back pain and depression. (A.R. 133, 161, 427-28.)  Plaintiff has past relevant work experience as a general clerk and legal secretary.  (A.R. 30.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration.  (A.R. 90-93, 95-98.)  On December 10, 2001, Plaintiff, who was represented by counsel, appeared at a hearing before Administrative Law Judge David L. Wurzel ("ALJ Wurzel").  (A.R. 510-608.)  On March 18, 2002, ALJ Wurzel denied Plaintiff's request for benefits.  (A.R. 76-89.)

In a June 13, 2003 order, the Appeals Council remanded the case to a new Administrative Law Judge, who was instructed to:  (1) give further consideration to the treating source opinions and explain the weight given to such opinion evidence; (2) give consideration to Plaintiff's back impairment and obtain additional evidence concerning this impairment to complete the administrative record in accordance with regulatory standards concerning consultative examinations and existing medical evidence; (3) further evaluate Plaintiff's mental impairment and

1   provide specific findings and an appropriate rationale for each of the
2   functional areas described in 20 C.F.R. § 404.1520a(c); (4) give further
3   consideration to Plaintiff's maximum residual functional capacity and
4   provide an appropriate rationale with specific references to the
5   evidence of record in support of the assessed limitations; (5) if
6   necessary, obtain evidence from a medical expert to clarify the nature
7   and severity of Plaintiff's impairments; and (6) if warranted by the
8   expanded record, obtain supplemental evidence from a vocational expert
9   to clarify the effects of the assessed limitations on Plaintiff's
10  occupational base.  (A.R. 125-28.)

11

12      On March 15, 2004, Plaintiff, who was represented by counsel,
13  appeared at a supplemental hearing before Administrative Law Judge
14  Edward Schneeberger ("ALJ").   (A.R. 423-506.)   The ALJ denied
15  Plaintiff's request for benefits on June 4, 2004.  (A.R. 24-44.)  On
16  April 27, 2005, the Appeals Council denied Plaintiff's request for
17  review of the ALJ's decision.  (A.R. 7-9.)

18

19                **SUMMARY OF ADMINISTRATIVE DECISION**

20

21      In his June 4, 2004 written decision, the ALJ found that Plaintiff
22  had not engaged in substantial gainful activity since her alleged onset
23  date.[2]  (A.R. 42.)  He found that Plaintiff had back pain and major
24  depression, but these impairments did not meet or equal any of the
25  listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (*Id.*)

26

27      [2]   The ALJ determined that Plaintiff met the non-disability
28  requirements for a period of disability and DIB, and was insured through
    March 31, 2003.  (A.R. 42.)

                                    3

The ALJ further found that Plaintiff's complaints generally were not credible. (A.R. 36-40, 42.)

In setting forth Plaintiff's physical residual functional capacity, the ALJ found that Plaintiff: could lift and carry 20 pounds occasionally and ten pounds frequently; stand/walk or sit for six hours in an eight-hour workday; required the option to alternate between sitting and standing every hour; could not work around heights; and could kneel, bend, stoop, squat, crawl, or climb occasionally. (A.R. 42.)

In setting forth Plaintiff's mental residual functional capacity, the ALJ found that Plaintiff was: "moderately" limited in her ability to remember locations and work-like procedures; "markedly" limited in her ability to understand and remember detailed instructions; "markedly" limited in her ability to carry out detailed instructions; "moderately" limited in her ability to maintain attention and concentration for extended periods; "moderately" limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; "moderately" limited in her ability to travel in unfamiliar places or use public transportation; "moderately" limited in her ability to set realistic goals or make plans independently of others; "slightly" limited in her ability to understand and remember very short and simple instructions; "slightly" limited in her ability to carry out very short and simple instructions; "slightly" limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

4

"slightly" limited in her ability to sustain an ordinary routine without special supervision; "slightly" limited in her ability to work in coordination within a proximity to others without being distracted by them; "slightly" limited in her ability to make simple work-related decisions; "slightly" limited in her ability to interact appropriately with the general public; "slightly" limited in her ability to accept instructions and respond appropriately to criticism from supervisors; "slightly" limited in her ability to respond appropriately to changes in the work setting; and "slightly" limited in her ability to be aware of normal hazards and take appropriate precautions. (A.R. 42-43.)

The ALJ concluded that Plaintiff was able to perform her past relevant work as a general clerk.[3] (A.R. 43.) Accordingly, the ALJ found that Plaintiff was not "disabled" within the meaning of the Social Security Act. (*Id.*)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards. <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is "more than a

---

[3]     This determination was based on the testimony of Susan Green, a vocational expert. (A.R. 485-506.) Ms. Green testified that a hypothetical individual with Plaintiff's age, education, vocational background, and stated residual functional capacity could perform Plaintiff's past relevant work as a general clerk but not as a legal secretary. (A.R. 486-502.)

1   mere scintilla but less than a preponderance - it is such relevant
2   evidence that a reasonable mind might accept as adequate to support the
3   conclusion." Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995).

4

5   Although this Court cannot substitute its discretion for that of
6   the Commissioner, this Court nonetheless must review the record as a
7   whole, "weighing both the evidence that supports and the evidence that
8   detracts from the [Commissioner's] conclusion." Desrosiers v. Secretary
9   of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988); *see also*
10  Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  "The ALJ is
11  responsible for determining credibility, resolving conflicts in medical
12  testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d
13  1035, 1039 (9th Cir. 1995).  This Court must uphold the Commissioner's
14  decision if it is supported by substantial evidence and free from legal
15  error, even when the record reasonably supports more than one rational
16  interpretation of the evidence.  *Id.* at 1039-40; *see also* Morgan v.
17  Commissioner of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999);
18  Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1457 (9th
19  Cir. 1995).

20

21                              **DISCUSSION**

22

23  Plaintiff alleges three issues:  (1) Plaintiff contends that the
24  ALJ erred in relying on the testimony of the vocational expert; (2) she
25  contends that the ALJ improperly rejected the findings of the Office of
26  Workers' Compensation Programs ("OWCP"); and (3) she contends that the
27  ALJ failed to articulate sufficient reasons for rejecting the opinion of
28  the treating physician.  (JS at 4, 16, 19.)  These issues will be

addressed below in an order different from that in which they were presented in the JS.

## A.   <u>**The ALJ Properly Disregarded The Treating Physician's Opinion**</u>.

Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant. <u>Smolen</u>, 80 F.3d at 1285; <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). Although the treating physician's opinion is entitled to great deference, it is not necessarily conclusive as to the question of disability. *Id.* Moreover, where the treating physician's opinion is uncontradicted, it may be rejected only for "clear and convincing" reasons. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). If the treating physician's opinion is contradicted, the ALJ may reject it in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record. *See* <u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1453-54 (9th Cir. 1993).

Dr. Samuel Albert became Plaintiff's treating psychiatrist on March 22, 1999. (A.R. 356.) On November 12, 1999, Dr. Albert completed a report describing Plaintiff's mental impairment. (A.R. 290-306.) In his report, Dr. Albert noted that Plaintiff's complaints of harassment by coworkers caused her to experience serious psychiatric symptoms. (A.R. 291-97.) Plaintiff reported that these symptoms became progressively worse and resulted in her inability to do any work. (A.R.

297-98.)   Dr. Albert further recorded the findings of a Recent Life Changes Questionnaire, Millon Multiaxial Personality Inventory - III ("MCMI-III"), and Beck Depression Inventory ("BDI").  (A.R. 300-04.)   He noted that Plaintiff had significant problems with attention span and recent memory and that she displayed a "clear inability . . . to concentrate and [work] steadily in any situation."  (A.R. 300.)   Dr. Albert diagnosed Plaintiff with major depressive disorder, single episode, severe, and assessed Plaintiff's Global Assessment of Functioning score ("GAF") at 35.[4]  (A.R. 304-05.)   He concluded that Plaintiff's prognosis was "very poor."  (A.R. 305.)   However, Dr. Albert opined that Plaintiff was competent to manage funds on her own behalf. (A.R. 306.)

On March 8, 2001, Dr. Albert completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment" form.  In that form, he found that Plaintiff had "marked" limitations in her ability to:  remember locations and work-like procedures; understand and remember detailed instructions; carry out short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and

---

[4]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000)(hereinafter "DSM IV").

A GAF score of 31-40 denotes "[some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)."  DSM IV at 34.

be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; make simple work-related decisions; complete a normal work-day and work-week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (A.R. 282-84.) In addition, Dr. Albert found that Plaintiff had "moderate" limitations in her ability to:  understand and remember very short and simple instructions; interact appropriately with the general public; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (A.R. 282-83.)  Dr. Albert concluded in this report that Plaintiff was "totally disabled."  (A.R. 285.)

Thereafter, Dr. Albert completed two additional reports discussing Plaintiff's symptoms and limitations, dated May 25, 2001, and September 13, 2002.  (A.R. 310-15, 370-78.)  In his May 25, 2001 report, Dr. Albert noted that Plaintiff's mental condition was "essentially unimproved." (A.R. 310.)  He diagnosed Plaintiff with "major depressive disorder, single episode, severe" and again assessed her with a GAF of 35.  (A.R. 312.)  In his September 13, 2002 report, Dr. Albert provided the same diagnosis and GAF.  (A.R. 373.)  In support of his conclusions,

1   Dr. Albert relied upon the results of numerous psychological

2   evaluations, including a Minnesota Multiphasic Personality Inventory -

3   2 ("MMPI-2"), MCMI-III, BDI, Recent Life Changes Questionnaire, and Beck

4   Anxiety Inventory ("BAI").  (A.R. 374-76.)   In particular, Dr. Albert

5   cited the results of the MMPI-2 test, which indicated "acute anxiety,"

6   "depressed mood," and "mental confusion" (A.R. 374.)  He also cited the

7   MCMI-III test as suggesting that Plaintiff had developed "[inadequate]

8   internal cohesion," "less than satisfactory hierarchy of coping

9   strategies," and "deficient or incompetent" "interpersonal conduct."

10  (A.R. 374-75.)   Additionally, he noted that the BDI and BAI tests

11  revealed, respectively, that Plaintiff had "severe" depression and

12  anxiety.  (A.R. 375.)

13

14      In rejecting the opinions of Dr. Albert, the ALJ stated, in

15  pertinent part:

16

17          [Plaintiff] hangs her hat on the opinion of Dr. Albert,

18      who did not begin to treat her until March 22, 1999 (Exhibit

19      14F, p. 2 & Exhibit 12F, p. 26), well over a year after her

20      alleged onset date of December 22, 1997.  He consistently

21      renders a GAF of 35 (Exhibit 14F, p. 4; 11F, p. 6; 10F, p.

22      26).  Dr. Albert has become quite an advocate for [Plaintiff]

23      and even attended the consultative examination exam on

24      November 10, 2003 (Exhibit 16F).

25

26      The functional assessments submitted by Dr. Albert

27      (Exhibit 10F, pp. 11-27, Exhibit 10F, 3-6, Exhibit 11F, pp. 4-

28      10 & Exhibit 14F), are so absolutely prohibitive of any

1    activity that they are difficult to accept, especially since

2    Dr. Albert offers no objective basis for the opinion, and the

3    extreme limitations indicated by him are markedly inconsistent

4    with his "progress" notes, which are very brief and lacking in

5    specific symptomatology or clinical findings (**Please** see

6    Exhibit 12F, Exhibit 10F, pp. 8-10 & Exhibit 11F, p. 2)....

8        Moreover, after December 2001, the medical record fails

9    to show that [Plaintiff] sought any additional medical

10   treatment until September 2002 (Exhibit 14F, page 1).

11   [footnote omitted] As such, it is reasonable to conclude that

12   [Plaintiff's] mental condition was fairly stable during that

13   more than eight month gap in treatment . . . .

15       The medical expert was called to listen to the testimony

16   and evaluate <u>all</u> of the evidence in an attempt to pull

17   together consistent information and reject inconsistencies.

19       The medical expert testified that [Plaintiff] suffers

20   from a nonspecific depressive disorder.  The medical expert

21   testified that he "has never encountered anything like Dr.

22   Albert's records."  The medical expert says that Dr. Albert's

23   notes do not have <u>any</u> content other than conclusory material.

24   Dr. Albert does not identify any symptoms or progress as a

25   result of treatment (**Please** see Exhibit 12F, Exhibit 10F, pp.

26   8-10 & Exhibit 11F, p. 2).

28       Most remarkable, according to the medical expert, is the

11

total deviation of these records from recognized professional's standards. He identified Dr. Albert's testing reports as the "most ludicrous" he has <u>ever</u> seen, failing to report any scores or reliability scales (Exhibit 10F & Exhibit 14F). The medical expert said the way in which the testing was reported was a "complete misuse" of the testing process.

The medical expert says that he does not understand why Dr. Albert was physically at the consultative examination (Exhibit 16F, p. 1), and calls this appearance a "distorting effect."

The medical expert testified that the result of the MMPI "F Scale" at Exhibit 16F, p. 6 is so high that there is little doubt that [Plaintiff] is malingering or exaggerating her symptoms. The only alternative theory would be a "cry for help" that would <u>require</u> a mental condition so medically severe that the [Plaintiff] would be hospitalized for that condition.

The full scale IQ results are simply "unimaginable," according to the medical expert, unless [Plaintiff] was in a mental hospital. The vocabulary portion of the testing does not show someone with a college degree, such as [Plaintiff] testified she has (Testimony received at the March 15, 2004 hearing). There is no reported head trauma or associated impairment that would account for such low Bender scores.

12

1         The [ALJ] finds that the treating physician, Dr. Albert,

2    has been totally and absolutely discredited in this case.

3    Both counsel and the medical expert, in different ways, have

4    exposed Dr. Albert as a person who has clearly exaggerated and

5    underdeveloped [Plaintiff's] mental profile.  Dr. Albert's

6    insistence of a GAF of 35 and an opinion that [Plaintiff] has

7    a complete inability to do anything defies the objective

8    evidence in this case.  Furthermore, the total deviation by

9    Dr. Albert from the standards established by those in the

10   mental health field result[s] in a total disregard for his

11   conclusions. [Plaintiff's] attorney seeks to perpetuate this

12   charade by requesting that Dr. Albert himself perform the

13   consultative exam, when, in fact, the consultative exam was an

14   attempt to obtain an opinion from a mental health professional

15   who was objective (Exhibit 17B).  It is this determined effort

16   to attempt to exclude impartial and objective evidence that

17   mark[s] the demise of Dr. Albert's credibility.

18

19   (A.R. 34-36; emphasis in original.)

20

21       Plaintiff contends that the ALJ failed to weigh Dr. Albert's

22   opinions properly.  (JS at 24-26.)  In particular, Plaintiff alleges

23   that the ALJ's reasons for rejecting Dr. Albert's opinions were not

24   "legitimate," because the opinions of Dr. E. Richard Dorsey, Dr. Mark

25   Perrault, and Dr. Jack Stephenson supported, partially or fully, Dr.

26

27

28

13

1  Albert's findings.[5]  (JS at 25-26.)

2

3      While it is true that Dr. Dorsey's opinion apparently supports Dr.

4  Albert's findings, the only evidence of record regarding Dr. Dorsey's

5  opinion is a mere reference to it in a Workers' Compensation memorandum,

6

---

7      [5]   Plaintiff further contends that:  1) the ALJ's finding that

8  Dr. Albert did not begin treatment until March 22, 1999, was not a
   specific or legitimate reason for discounting his opinion; 2) the ALJ

9  did not explain how Dr. Albert's consistent diagnoses of a GAF score of
   35 detracted from Dr. Albert's opinion; 3) the ALJ failed to explain why

10 Dr.  Albert's  attendance  at  the  consultative  examination  was
   inappropriate; 4) the ALJ did not comment on the extent of Dr. Albert's

11 opinion  in  light  of  the  implicit  statement  by  Dr.  Perrault  that
   Plaintiff would not have the ability to work until after she achieved

12 amelioration of her symptoms with appropriate treatment; 5) the ALJ did
   not explain his rejection of Dr. Albert's opinion in light of the

13 significant limitations imposed by Dr. Stephenson; 6) the ALJ improperly
   noted a purported lack of treatment between December 2001 and September

14 2002; 7) the ALJ improperly noted the lack of reported test scores by
   Dr. Albert in light of the significant limitations imposed by Dr.

15 Stephenson, who did report test scores; 8) the ALJ failed to explain how
   the opinions of state agency physicians provided a basis for rejecting

16 Dr. Albert's opinion, which is supported by part or all of the opinions
   of Drs. Dorsey, Perrault, and/or Stephenson; and 9) the ALJ failed to

17 articulate legitimate reasons for rejecting Dr. Albert's opinion in
   light of the opinions of Drs. Dorsey, Perrault, and Stephenson. (JS at

18 24-26.)

19      The Court agrees with Plaintiff's first and sixth arguments --
   that Dr. Albert's failure to begin treatment until March 22, 1999 (*i.e.*,

20 over a year after Plaintiff's alleged onset date) and Plaintiff's
   failure to receive treatment between December 2001, and September 2002,

21 are not specific and legitimate reasons for rejecting Dr. Albert's
   opinion. (JS at 24-25.).  *See* Nguyen v. Chater, 100 F.3d 1462, 1465 (9th

22 Cir. 1996)(an ALJ may not discredit a treating physician based on the
   claimant's lack of treatment for depression, because "it is a

23 questionable practice to chastise one with a mental impairment for the
   exercise  of  poor  judgment  in  seeking  rehabilitation")(quoting

24 Blankenship v. Bowen,  874  F.2d  1116,  1124  (6th  Cir.  1989)).
   Nevertheless, as will be elaborated below, the ALJ provided other

25 sufficient grounds for rejecting Dr. Albert's opinion.

26      Plaintiff's second argument is not addressed, as the ALJ did
   not state this as a reason for rejecting Dr. Albert's opinion.

27 Plaintiff's third, fourth, fifth, seventh, and ninth arguments will be
   addressed herein.  Plaintiff's eighth argument is unpersuasive, because

28 the ALJ did not rely upon the state agency physicians' opinions as a
   basis for rejecting Dr. Albert's assessments.

1  stating that Dr. Dorsey's report "is in essential agreement with Dr.

2  Albert's report."[6]  (A.R. 152-53.)  Without any evidence of Dr. Dorsey's

3  specific findings and his reasons for supporting them, the ALJ could not

4  have assessed his opinion.  Accordingly, the ALJ properly relied on

5  other evidence in the record.

6

7       Plaintiff's contention that the ALJ improperly rejected Dr.

8  Albert's opinions, because they were supported by the opinions of Dr.

9  Perrault and Dr. Stephenson, is similarly without merit.  (JS at 25-26.)

10 In his November 3, 2002 consultative psychiatric evaluation, Dr.

11 Perrault concluded that Plaintiff "deserve[d] psychiatric treatment to

12 see whether she [could] return to the work force."  (A.R. 265.)  Despite

13 Plaintiff's contention that Dr. Perrault's opinion constituted an

14 implied finding of disability, Dr. Perrault also assessed Plaintiff with

15 functional limitations that were not indicative of disability.[7]

16 Moreover, the functional assessments assessed by Dr. Perrault starkly

17

18     [6]   Dave Seidel, a reconsideration examiner for the OWCP, reported
   that Dr. Dorsey's report had been received and was essentially in
19 agreement with Dr. Albert's report.  (A.R. 153.)  Mr. Seidel noted that
   Dr. Dorsey agreed with Dr. Albert's opinion that Plaintiff sustained a
20 medical condition that was secondary to employment factors, and she
   continued to be totally unable to perform her federal job based on her
21 disabilities.  (Id.)  Mr. Seidel commented, however, that the two
   opinions differed in the diagnosis of Plaintiff's ailment, with Dr.
22 Albert opining that Plaintiff had a major depressive disorder, and Dr.
   Dorsey finding that Plaintiff had a depressive disorder.  (Id.)  Mr.
23 Seidel concluded that the difference had no effect on Plaintiff's
   entitlement to treatment or compensation.  (Id.)

24     [7]   Specifically, Dr. Perrault found that Plaintiff was: "mildly"
   to "moderately" impaired in her ability to accept supervision; "mildly"
25 impaired in her ability to interact with co-workers; "mildly" impaired
   in her ability to remember, concentrate on, and attend to simple tasks;
26 "mildly" to "moderately" impaired in her ability to remember,
   concentrate on, and attend to more complex tasks; "mildly" to
27 "moderately" impaired in her ability to adapt to changes in scheduling
   and to novel situations; and "unimpaired" in her ability to adhere to
28 work-related scheduling.  (A.R. 264.)

15

contrast with Dr. Albert's findings of primarily "marked" limitations. (A.R. 282-84.)   Nevertheless, the ALJ appropriately rejected Dr. Perrault's opinion, in favor of Dr. Stephenson's opinion, because Dr. Perrault's examination was not based on objective testing and, instead, was primarily based on an interview with Plaintiff.  (A.R. 36.).  *See* Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004)("When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.").

Plaintiff's argument that Dr. Stephenson's opinion supported Dr. Albert's findings is unavailing, because a review of Dr. Stephenson's opinion shows that it, in fact, does *not* support Dr. Albert's findings.[8] As further discussed below, Dr. Stephenson found mostly "moderate" and "slight" limitations in Plaintiff's mental residual functional capacity. (A.R. 393-98.)  In fact, Dr. Stephenson and Dr. Albert agreed only that Plaintiff was "markedly" limited in her ability to understand, remember, and carry out *detailed* instructions.  (A.R. 282, 394; emphasis added.)

Furthermore, as the ALJ noted, Dr. Albert's findings of extreme limitations were "markedly inconsistent" with his progress notes. (A.R. 34.)   Although the medical records from Dr. Albert contain progress notes from over 47 sessions, such progress notes reflect virtually no reference to any signs or symptoms of a mental impairment.   They primarily note that Plaintiff "had a scheduled session."  (*See, e.g.*, A.R. 288-89, 308, 333, 335-47, 349-54.)  Indeed, the only progress notes

---

[8]    Although Plaintiff cites Dr. Stephenson's opinion as support for the validity of Dr. Albert's findings, Plaintiff contends that the ALJ should not have adopted Dr. Stephenson's opinion.  (JS at 37.)

1  that refer to Plaintiff's mental impairment are those dated February 18,

2  2000, and November 27, 2001. (A.R. 288, 308, 350.) Specifically, the

3  February 18, 2000 progress note indicates that "[Plaintiff continued] to

4  demonstrate the numerous symptoms indicating that she [continued] to be

5  disabled," and the November 27, 2001 progress note simply indicates

6  "depressed mood." (A.R. 288, 308, 350.) Thus, Dr. Albert's vague and

7  uninformative progress notes fail to support his extreme limitations

8  findings. *See* Thomas v. Barnhart, 278 F. 3d 947, 957 (9th Cir.

9  2002)(explaining that the ALJ need not accept the opinion of any

10  physician, including a treating physician, if that physician's opinion

11  is brief, conclusory, and inadequately supported by critical findings).

12

13      Dr. Albert's findings appear to be based primarily, if not solely,

14  on Plaintiff's subjective complaints. In his decision, the ALJ properly

15  discounted Plaintiff's subjective symptoms allegations, a finding which

16  Plaintiff does not challenge.[9] (A.R. 36-40.). *See* Andrews, 53 F.3d at

17  1043 ("[A]n opinion of disability premised to a large extent upon the

18  claimant's own accounts of his symptoms and limitations may be

19  disregarded, once those complaints have themselves been properly

20

21      [9]   In discounting Plaintiff's subjective symptoms, the ALJ cited

22  multiple inconsistencies in Plaintiff's testimony. For example, the ALJ
    noted inconsistent statements concerning the level of education
    Plaintiff attained. (A.R. 37.) The ALJ also observed that, despite

23  complaining of disabling back pain, Plaintiff became pregnant and bore
    a child. (*Id.*) In addition, the ALJ noted Plaintiff's inconsistent

24  testimony that she could not lift 20 pounds but could lift her child,
    who weighed 30 pounds. (*Id.*)

25

26      The ALJ also discredited Plaintiff's testimony by citing
    evidence of inconsistent and conservative treatment she received for her

27  alleged back pain. (A.R. 37.) Finally, the ALJ commented that,
    according to Dr. Steven Wells, a medical expert, as well as Dr. Jack

28  Stephenson, a consultative examiner, Plaintiff's psychological test
    scores suggested she was malingering. (A.R. 40, 389.)

17

discounted.")(citing <u>Flaten</u>, 44 F.3d at 1463-64).


In addition, in rejecting Dr. Albert's opinions, the ALJ properly explained that Dr. Albert failed to provide a sufficient objective basis for his opinion.  (A.R. 34, 36.)  *See also* <u>Ramirez</u>, 8 F.3d at 1453-54. Dr. Albert's three reports, which purportedly support his findings, mainly detail Plaintiff's complaints.  (*See* A.R. 291-306, 310-15, 370-78.)  Although the November 12, 1999 and September 11, 2002 reports contain the results of psychological tests (*i.e.*, Recent Life Changes Questionnaire, BAI test, BDI test, MCMI-III test, and MMPI-2 test) administered by Dr. Albert, the tests were correctly deemed *not* to be objective.  (A.R. 300-01, 374-76.)


The ALJ found that "the total deviation by Dr. Albert from the standards established by those in the mental health field result[ed] in a total disregard for his conclusions."  (A.R. 36.)  This determination was based on the testimony of Dr. Wells, who asserted that Dr. Albert's failure to cite any evidence related to Plaintiff's clinical symptomatology in his progress notes was a deviation from the community standard.[10]  (A.R. 478.)  In addition, Dr. Wells testified that Dr. Albert's testing reports were among "the most ludicrous reports of psychological testing [he had] ever seen," explaining that Dr. Albert's failure to report the scores and validity of various psychological tests was a "complete misuse of psychological tests."  (A.R. 479.)

---

[10]   At the March 15, 2004 hearing, Dr. Wells testified that he had "never seen a record with progress notes like [Dr. Albert's progress notes]."  (A.R. 478.)  Dr. Wells also stated that there was "simply no content that relate[d] to clinical symptomatology," and thus, he could not accept any conclusions based on a record of this sort.  (*Id.*)

1    Specifically, as explained by Dr. Wells, because the Recent Life
2    Changes Questionnaire, BAI test, and BDI test contain no validity
3    measures and are solely based on the responses by the subject, which
4    indicate the extent of her stress, depression, or anxiety, they are not
5    considered to be objective clinical tests.  (A.R. 479.)  Other tests,
6    such as the MCMI-III and MMPI-2 tests, have validity scales to assess
7    the reliability of the subject's responses and, therefore, give rise to
8    objective clinical findings.   However, Dr. Albert failed to report
9    Plaintiff's scores on these objective tests.  (A.R. 301, 374-75, 479.)
10   Instead, Dr. Albert merely stated his interpretations of the tests and
11   concluded that they supported his findings.  (*Id.*)   More importantly,
12   Dr. Albert failed to indicate test validity scales to assess the
13   credibility of Plaintiff's responses concerning the extent of her mental
14   impairment.  (*Id.*)  As Dr. Wells cogently explained, in the absence of
15   any scores or validity scales, the results from the MCMI-III and MMPI-2
16   tests failed to constitute objective evidence in support of Dr. Albert's
17   findings.  (A.R. 479.)  *See also* <u>Baalist v. Barnhart</u>, 427 F.3d 1211,
18   1216 (9th Cir. 2005)("[A]n ALJ need not accept the opinion of a doctor
19   if that opinion is brief, conclusory, and inadequately supported by
20   clinical findings.").

21

22   Furthermore, the ALJ rightly commented on Dr. Albert's unusual
23   presence at Dr. Stephenson's consultative examination of Plaintiff as
24   compromising Dr. Albert's professional credibility.  (A.R. 34.)  Dr.
25   Wells characterized Dr. Albert's attendance of the examination as
26   "inappropriate" and suggested that this may have had a "distorting
27   effect" on the examination.  (A.R. 34, 480.)

28

In reaching his ultimate conclusion regarding Plaintiff's mental residual functional capacity, the ALJ adopted the findings of Dr. Stephenson, who conducted a consultative psychological evaluation of Plaintiff on November 10, 2003.  (A.R. 36, 384-99.)  Dr. Stephenson administered various tests, including a Folstein Mini-Mental Status Examination, a Wechsler Adult Intelligence Scale - 3rd Edition ("WAIS-III"), a Wechsler Memory Scale - 3rd Edition ("WMS-III"), an MMPI-2, a BDI-II, a Bender Visual Motor Gestalt Test ("Bender"), and a Trail Making Test, Parts A and B.[11]  (A.R. 387-89, 391-92.)

Dr. Stephenson reported the scores of the tests along with the validity scales of the MMPI-2.  (A.R. 391.)  Thereafter, he concluded that Plaintiff tested intellectually in the "mild mentally deficient range," with no significant difference between verbal abilities (mild mentally deficient range) and nonverbal abilities (borderline range).  (A.R. 389, 391.)  He noted, however, that Plaintiff's prior work

---

[11]   The WAIS-III assesses intellectual ability, including verbal and nonverbal functioning.  (A.R. 388.)

The WMS-III assesses three domains of memory, including immediate, delayed, and working memory.  Each domain is tested in two modalities, auditory and visual.  (A.R. 388.)

The MMPI-2 assessed personality and emotional functioning.  (A.R. 389.)

The BDI is a self-report questionnaire assessing the test subject's level of depression over the past two weeks.  (A.R. 389.)

The Bender is a visuo-motor task requiring the test subject to copy a series of geometric line drawings for the purpose of identifying brain dysfunction.  (A.R. 389.)

The Trail Making Test is a timed task that measures sustained attention, visual search, and psychomotor efficiency (Part A), in addition to the more complex requirements of shifting flexibly between two sets of information (Part B).  (A.R. 389.)

history, her ability to raise two children independently, and the fact that she could obtain a driver's license all suggested a higher level of cognitive ability than the testing revealed.  (A.R. 389.)

In addition, Dr. Stephenson found that: On the Wechsler Memory Scale - Third Edition (WMS-III) test, Plaintiff's verbal memory was in the "borderline range" on immediate and delayed recall; her visual memory was in the "low average range" on immediate recall, but was in an anomalous "high average range" on delayed recall; and her working memory was in the "low average range" on visual tasks and in the impaired range on auditory tasks.  (A.R. 388-89, 391.)  Dr. Stephenson found that Plaintiff's performance on the Bender was within "normal limits," however, with no evidence of an organic disorder.  (A.R. 390-91.)  But, the Trail Making Test revealed that Plaintiff was in the "impaired range" with slowed performance.  (*Id.*)

Critically, Dr. Stephenson also noted that the test results may have "underestimate[d] [Plaintiff's] level of cognitive ability because of an exceedingly elevated F validity scale on the [MMPI-2] that [made] the [MMPI-2] protocol invalid and may [have been] indicative of an exaggeration of symptoms."[12]  (A.R. 389.)  Dr. Stephenson ultimately diagnosed Plaintiff with "By History, Major Depressive Disorder."  (A.R.

---

[12]   Plaintiff's test scores are strikingly at odds with her educational and employment history.  Plaintiff testified at the March 15, 2004 hearing that she received her college degree in Paralegal Studies at Cal State Los Angeles in 1994, and while in college, she worked part-time at the Federal Trade Commission as a student-clerk. (A.R. 437.)  Thereafter, Plaintiff worked for the United States Department of Justice as a legal clerk and part-time paralegal assisting lawyers and the U.S. Bankruptcy Trustee in preparing cases for hearings. (A.R. 435-36.)

1    390.)

2

3        In a check-off mental assessment form, Dr. Stephenson assessed
4    Plaintiff with "marked" limitations in her abilities to understand,
5    remember, and carry out detailed instructions.   (A.R. 394.)
6    Additionally, he found that Plaintiff had "moderate" limitations in her
7    ability to:   remember locations and work-like procedures; maintain
8    attention and concentration for extended periods; complete a normal
9    workday and workweek without interruptions from psychologically based
10   symptoms and perform at a consistent pace without an unreasonable number
11   and length of rest periods; travel in unfamiliar places or use public
12   transportation; and set realistic goals or make plans independently of
13   others.   (A.R. 393-94, 396, 398.)   Dr. Stephenson further found that
14   Plaintiff had "slight" limitations in her ability to:   understand and
15   remember very short and simple instructions; carry out very short and
16   simple instructions; perform activities within a schedule, maintain
17   regular attendance and be punctual within customary tolerances; sustain
18   an ordinary routine without special supervision; work in coordination
19   within a proximity to others without being distracted by them; make
20   simple work related decisions; interact appropriately with the general
21   public; accept instructions and respond appropriately to criticism from
22   supervisors; respond appropriately to changes in the work setting; and
23   be aware of normal hazards and take appropriate precautions.   (A.R. 393-
24   98.)

25

26       The opinion of an examining physician may constitute substantial
27   evidence of a claimant's residual functional capacity where it rests on
28   an independent examination of the claimant.   *See* <u>Tonapetyan v. Halter</u>,

242 F.3d 1145, 1149 (9th Cir. 2001); Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984)).  Here, for the reasons set forth above, the ALJ properly resolved the conflict between the opinion of Dr. Albert and the opinions of Dr. Walls and Dr. Stephenson.  Andrews, 53 F.3d at 1041 ("Where the opinion of a claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.").

Accordingly, the Court finds no reversible error based on the ALJ's rejection of Dr. Albert's opinion and adoption of the findings of Dr. Stephenson.

**B.**   **The ALJ Properly Considered The Findings Of The OWCP.**

In ruling on Plaintiff's claim for workers' compensation, the Office of Worker's Compensation Programs ("OWCP") found that Plaintiff could not perform her work as an office clerk based on the reports from Dr. Albert and Dr. Dorsey.  (A.R. 152.)  Plaintiff contends that the ALJ failed to articulate reasons for rejecting the OWCP's determination that Plaintiff was entitled to workers' compensation benefits.  (JS at 17.) In addition, Plaintiff argues that the rejection of the underlying physicians' opinions that support the OWCP's decision does not suffice to satisfy the legal standard promulgated in McCartey, 298 F.3d at 1076. (JS at 19.)

McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002), held

23

that an ALJ must give consideration to a Veterans Affairs's disability finding, because, in part, both programs "serve the same governmental purpose [of] providing benefits to those unable to work because of a serious disability . . . and [both programs] are administered by the federal government [and] . . . share a common incentive to weed out meritless claims." The ALJ may give less weight to a Veterans Affairs's disability finding if he gives "persuasive, specific, valid reasons" for doing so that are supported by the record. *Id.*

As an initial matter, the Court notes that Plaintiff fails to cite authority supporting her argument that a decision from the OWCP requires the same treatment as one from Veterans Affairs. Furthermore, assuming arguendo the correctness of Plaintiff's argument, this case is distinguishable from McCartey. In McCartey, the record supporting the Veterans Affairs's decision described the functional limitations of the claimant and contained the medical records that supported those findings. McCartey, 298 F.3d at 1074-75. Therefore, the ALJ was able to evaluate the reliability of the Veterans Affairs's decision and reject it if legitimate reasons could be provided.

The record from the OWCP in the instant case is devoid of any detail concerning the assessments of Plaintiff's functional limitations and the medical records in support of such assessments. (*See* A.R. 147-53.) The OWCP record simply notes that Dr. Dorsey, the non-examining consultative psychiatrist, agreed with Dr. Albert's report that Plaintiff "sustained a medical condition which [was] secondary to employment factors and that she was and continue[d] to be totally disabled from her federal job." (A.R. 153.) Moreover, the reports from

24

Dr. Albert and Dr. Dorsey were not included in the record from the OWCP. Without any meaningful information in the record from the OWCP, the ALJ could not have properly relied upon the OWCP's decision. *See* Thomas, 278 F.3d at 957 (ALJ need not rely upon a medical report that if it is conclusory and unsupported by clinical findings).

Nevertheless, the ALJ did consider Dr. Albert's reports and progress notes contained in the record. As previously noted, the ALJ properly rejected Dr. Albert's findings and adopted Dr. Stephenson's opinion.[13] Therefore, the ALJ did not err in failing to expressly reject the OWCP's "disability" finding.

**C.   The ALJ Improperly Relied On The Testimony Of The Vocational Expert.**

At step four of the Social Security disability determination, the claimant has the burden of showing that she can no longer perform her past relevant work. Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001). Although the burden of proof lies with the claimant at step four, the ALJ "still has a duty to make the requisite factual findings to support his conclusion." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001)(citing Social Security Ruling 82-62). Information from the Dictionary of Occupational Titles ("DOT") or the testimony of a vocational expert may be used to ascertain the demands of an occupation as ordinarily required by employers throughout the national economy.

---

[13]   Dr. Dorsey's opinion could not have been assessed, because his report was not part of the record for the DIB claim. Moreover, as discussed above, other substantial evidence was properly relied upon in determining Plaintiff's residual functional capacity.

Social Security Ruling 82-61.  The claimant must be able to perform the job as he actually performed it, or as it is generally performed in the national economy.  Social Security Ruling 82-61; <u>Pinto</u>, 249 F.3d at 844.

According to DOT code 209.562-010, the occupation of a general clerk requires Reasoning Level Three (out of a 6-point scale), where a claimant must have the mental capacity to perform the following:

> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

DOT, Appendix C, § III.

In comparison, Reasoning Level Two requires a claimant to have the mental capacity to perform the following:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

DOT, Appendix C, § III.

The ALJ found that Plaintiff:  could perform "light" work; required an option of being able to alternate between sitting and standing every hour; could not work around heights; and could not kneel, bend, stoop,

26

squat, crawl, or climb more than occasionally. (A.R. 42.)  In addition, the ALJ determined that Plaintiff had numerous mental limitations, including: "marked" limitations in her ability to understand, remember, and carry out detailed instructions; "moderate" limitations in her ability to remember locations and work-like procedures; "moderate" limitations in her ability to maintain attention and concentration for extended periods; and "slight" limitations in her ability to understand, remember, and carry out very short and simple instructions. (A.R. 42-43.)  Based on the testimony of the vocational expert, the ALJ concluded that Plaintiff could perform her past relevant work as a general clerk.[14] (A.R. 43.)

Plaintiff contends that the vocational expert's testimony did not constitute substantial evidence to support the ALJ's finding that Plaintiff can perform her past relevant work as a general clerk. Specifically, Plaintiff contends that the DOT's definition for this job contains a Reasoning Level that is in excess of Plaintiff's mental residual functional capacity, and the vocational expert did not provide an adequate explanation for deviating from the DOT's requirements. (JS at 7-11.)

The ALJ's conclusion that Plaintiff was capable of performing her past job as a general clerk does appear to be incompatible with Plaintiff's "marked" limitations in her ability to understand, remember, and carry out detailed instructions and her "slight" limitations in her

---

[14]   Although the ALJ did not expressly state in his decision that his opinion was based on the vocational expert's testimony, a thorough review of the March 15, 2004 hearing reveals that the ALJ's decision was based on her statements.  (A.R. 486-502.)

ability to understand, remember, and carry out very short and simple instructions. *See* <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1176 (10th Cir. 2005)(remanding because the limitation of a claimant who retains the attention, concentration, persistence, and pace levels required for simple and routine tasks "seems inconsistent with the demands of level-three reasoning"); <u>Lucy v. Chater</u>, 113 F.3d 905, 909 (8th Cir. 1997)(rejecting contention that a claimant who was limited to following only simple instructions could engage in the full range of sedentary work, because many unskilled jobs in that category require Reasoning Level Two or higher); <u>Hall-Grover v. Barnhart</u>, 2004 WL 1529283, *3 (D. Me. 2004)(concluding that the job of a "security monitor," to which the DOT assigned a Reasoning Level Three, was inconsistent with a limitation to simple, repetitive work).   In view of Plaintiff's "marked" and "slight" limitations in her abilities to remember and carry out instructions, the vocational expert's testimony that Plaintiff could perform her past relevant work as a general clerk conflicted with the DOT.

It is appropriate for an ALJ to rely on vocational expert testimony which contradicts the requirements in the DOT in instances where "the record contains persuasive evidence to support the deviation." *See* <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995).   When there is a conflict between the testimony of the vocational expert and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the vocational expert's testimony to support a decision about whether the claimant is disabled.   Social Security Ruling 00-4p; <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 793-94 (9th Cir. 1997)(remanding where discrepancies between findings on residual functional capacity and

28

1  the DOT were not explained by the ALJ or the vocational expert).

2

3       The vocational expert testified that a hypothetical individual with

4  Plaintiff's mental limitations could perform her past relevant work as

5  a general clerk, but eroded the number of available jobs 30 to 40

6  percent.  (A.R. 493-94.)  She explained that Plaintiff could perform

7  this job, because it was not "really that detailed," and noted that it

8  required "only an SVP [Specific Vocational Preparation] of 3."  (A.R.

9  496-97.)  She further testified that the job of a general clerk is

10 commensurate with SVP Level Three, because "where you only need . . . 30

11 days to three months to learn it is not detailed."  (*Id.*)

12

13      Here, the vocational expert's explanation did not constitute

14 persuasive evidence to support the deviation from the DOT.  In her

15 explanation, she failed to account for the deviation from the Reasoning

16 Level required for the job of a general clerk.  Her explanation suggests

17 that she may have misapprehended two separate vocational considerations,

18 namely the Reasoning Level and the SVP Level.  A job's SVP Level focuses

19 on the amount of lapsed time required by a typical worker to learn the

20 job's duties.  DOT, Appendix C, § II.  However, a job's Reasoning Level

21 gauges the minimal ability a worker needs to complete the job's tasks

22 (*i.e.*, aspects of education which are required of workers for

23 satisfactory job performance).  *Id.*  Nevertheless, as the vocational

24 expert did not provide an explanation regarding the deviation from the

25 DOT with respect to Plaintiff's Reasoning Level, the ALJ's finding that

26 Plaintiff could perform her past relevant work was not supported by

27 substantial evidence.

28

1    Furthermore, the Court notes that the vocational expert testified
2    that Plaintiff could perform her past relevant work as a general clerk
3    in response to a hypothetical question reflecting the physical
4    limitations the ALJ provided in his residual functional capacity
5    finding, but not reflecting the mental limitations provided in the ALJ's
6    residual functional capacity finding.   (A.R. 486.)   The vocational
7    expert testified that Plaintiff could perform her past relevant work as
8    a general clerk based on a hypothetical question which, although it
9    included the mental limitations found by the ALJ, did not include the
10   ALJ's physical limitations.[15]   (A.R. 493-502.)   *See* <u>Andrews</u>, 53 F.3d at
11   1044 (in order for the vocational expert's testimony to constitute
12   substantial evidence, an ALJ must pose hypothetical questions that
13   "consider all of the claimant's limitations").   However, the ALJ should
14   have included all of Plaintiff's limitations in the same question,
15   rather than in arguably separate hypotheticals; it is possible that a
16   question including Plaintiff's combination of mental and physical
17   impairments might direct a different conclusion.   *See, e.g.,* <u>Lewis v.</u>
18   <u>Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001)(decision regarding disability

19
20        [15]   Plaintiff's counsel posed hypothetical questions, which
     included the mental limitations found by the ALJ, to the vocational
21   expert.   (A.R. 493-502.)   In order to clarify whether any physical
     limitations were included in the hypothetical, the ALJ asked the
22   following questions:

23        ALJ:  Just -- so this hypothetical person would not have
          any exertional limitations?
24
          Plaintiff's Counsel:  Right, Your Honor.
25
          ALJ:  Okay.
26
          Counsel:  Only these limitations that I've just recited.
27
          ALJ:  Okay.
28
     (A.R. 494.)

must be based on a consideration of the combination of Plaintiff's impairments).

Accordingly, because of the inadequacies in the vocational expert's testimony, the ALJ's finding that Plaintiff can perform her past relevant work is not supported by substantial evidence.

**D.   Remand Is Required.**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  *Id.* at 1179 ("the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings").  However, where there are outstanding issues that must be resolved before a determination of disability can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated, remand is appropriate.  *Id.*

Here, remand is the appropriate remedy to allow the ALJ the opportunity to remedy the above-mentioned deficiencies and errors.  *See* Dodrill v. Shalala, 12 F.3d 915, 917-18 (9th Cir. 1993)(remand appropriate to allow ALJ to identify specific facts in the record demonstrating that the claimant was in less pain than she stated); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)(remand

31

1   appropriate to remedy defects in the record).

2

3                               **CONCLUSION**

4

5       Accordingly, for the reasons stated above, IT IS ORDERED that the

6   decision of the Commissioner is REVERSED, and this case is REMANDED for

7   further proceedings consistent with this Memorandum Opinion and Order.

8

9       IT IS FURTHER ORDERED that the Clerk of the Court shall serve

10  copies of this Memorandum Opinion and Order and the Judgment on counsel

11  for Plaintiff and for Defendant.

12

13      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

14

15  DATED: September 28, 2007

16

17                                          /s/

18                                MARGARET A. NAGLE
                                  UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28

                                       32